BAGNELL TIMBER COMPANY v. MISSOURI, KANSAS & TEXAS RAILROAD COMPANY, Appellant.

Division One, March 17, 1904.

1. **LIEN: Affidavit: Evidence.** Whether the statute requires a railroad lien to be verified or not, if it is in fact verified, and the signature of the affiant to the affidavit is the only signature or means of connecting the plaintiff with the paper which is offered as a lien, the whole paper, or none of it, should be offered in evidence. Plaintiff can not omit the affidavit and introduce the rest in evidence, for under such circumstances the paper is a single, entire instrument.

Bagnell Timber Co. v. M., K. & T. R. R. Co.

2. ———: **Railroad: Omission of Counties.** If the plaintiff's lien does not cover that part of the railroad which runs through certain counties, he is not entitled to a lien at all.

3. ———: ———: ———: **Amending Petition and Omitting Affidavit.** And where by a general description in the lien itself a lien is sought on all the railroad's properties in this State, and from the specific description in the affidavit of what counties the railroad runs through, certain counties are omitted, and the lien paper is single and can not be separated from the affidavit, plaintiff can not avoid the fatal effect of the omission from the specific description by amending his petition so as to conform to the general description contained in the lien itself, and by offering at the trial in evidence the lien paper without the affidavit.

4. ———: **Extent of Railroad Lien: Ties Used in Another State.** The seller of ties to a railroad company which were used on that part of the company's road which lies outside of this State, is not, under our statute (sec. 4239, R. S. 1899), entitled to a lien therefor upon that part of the railroad which is within this State. The statute being silent as to whether the seller is given a lien on the railroad in this State for materials used by it in another State, it is held that the statute ought not by implication to be so extended as to give him a lien, for materials so used, upon the properties of the railroad lying within this State. (Overruling Bridge Co. v. Railroad, 72 Mo. 664.)

5. ———: **Personal Judgment: Joint Contract.** Where the seller of materials sues upon a joint contract of sale with a railroad company and a firm of contractors, he must prove a joint contract, and is not entitled to the lien if the contract was with the firm alone; and an instruction which so tells the jury is error, not only as to the lien, but as to the personal judgment against the railroad as well.

6. **JOINT CONTRACT: Personal Judgment Against One: Proof.** Where the petition charges a joint contract, the proof must show a joint contract or the judgment can not stand against one of the defendants. Plaintiff sued a railroad and a firm of tie contractors for ties sold, and charged that they were sold under a joint contract with the railroad and the firm, and the evidence totally failed to show any agreement with the firm, or to show a contract with the railroad. *Held,* that this was not a mere case of variance, which is, under the statute, cured by the verdict, but is a total failure of proof, which is fatal to the verdict.

*Held,* by **Valliant, J.,** dissenting, that under our statute which makes joint contracts joint and several, the plaintiff, under a petition which charged a joint contract with the railroad

and the firm of contractors, could recover a personal judgment against the railroad alone on evidence tending to prove that the contract was made with the railroad alone.

Appeal from Pettis Circuit Court.—*Hon. Geo. F. Longan,* Judge.

REVERSED AND REMANDED.

*Montgomery & Montgomery* and *Geo. P. B. Jackson* for appellant.

(1)    The petition does not state facts sufficient to constitute cause of action.   The ''Exhibit'' is no part of the petition.   Kearney v. Woodson, 4 Mo. 114; Hadwen v. Ins. Co., 13 Mo. 473; Hall v. Harrison, 21 Mo. 227; Chambers v. Carthel, 35 Mo. 374; Deitz v. Corwin, 35 Mo. 376; Curry v. Lackey, 35 Mo. 389; Baker v. Berry, 37 Mo. 306; Dyer v. Krayer, 37 Mo. 603; Bowling v. McFarland, 38 Mo. 465; Kerr v. Ins. Co., 40 Mo. 19; Hickory Co. v. Fugate, 143 Mo. 71.   The petition itself does not state either directly, nor by necessary implication, the facts showing a performance of the contract by plaintiff.   It is not sufficient for the pleader to state mere conclusions.   Lankford v. Sanger, 40 Mo. 160; Pier v. Heinrichoffen, 52 Mo. 333; Cook v. Putnam County, 70 Mo. 668; Brown v. Cape Girardeau, 90 Mo. 377; Mitchell v. City of Clinton, 99 Mo. 153; Bank v. Tiger Tail Mill & Land Co., 152 Mo. 145.   For this reason the court erred in overruling the objection to the admission of any evidence and again in overruling the motion in arrest.   (2)    The paper filed in the circuit clerk's office as the ''lien paper'' was an entirety, and plaintiff had no right to select a portion of it and offer that only as evidence.   Starkie on Evidence (8 Am. Ed.), 528; Spangler v. Dellinger, 38 Cal. 278; English v. Johnson, 17 Cal. 108; Grumsey v. Ins. Co., 17 Minn. 104; Barbour v. Watts, 9 Ky. 290; Phillips v. Green, 21 Ky. 344; Bond v. Bond, 73 N. C. 67; University v. Har-

rison, 93 N. C. 84; Colman v. Creditors, 39 La. An.
1089; Bompart's Admr. v. Lucas, 32 Mo. 123; Hadda-
way v. Post, 35 Mo. App. 278; McCartney v. Ins. Co.,
45 Mo. App. 373; Lee's Admx. v. Lee, 21 Mo. 531;
Crone v. Dawson, 19 Mo. App. 214; Seymour v. New-
man, 77 Mo. App. 578.   (3)   The plaintiff was not en-
titled to recover because the petition alleged a contract
made jointly with the "M., K. & T. R. R. Co." and Gra-
ham & Miller, while no such contract was proven. The
sole effort of plaintiff through its evidence was to prove
a contract with the railroad company alone.   Hudson
v. Emmons, 107 Mich. 549; Gamble v. Kellum, 97 Ala.
677; Garrison v. Lumber Co., 111 Ala. 308; Peck v.
Staudart, 1 Ill. App. 288; Faulkner v. Faulkner, 73 Mo.
327; Railroad v. Sullivan, 25 Ga. 228; College v. Hend-
ley, 49 Cal. 347; Mace v. Page, 33 Mich. 38; Thompson
v. Stetson, 15 Neb. 112; Wycoff v. Loan & Trust Co.,
11 N. Y. Supp. 423; Snell v. DeLand, 43 Ill. 323; O'Neal
v. Boone, 82 Ill. 589; Proctor v. Reif, 52 Iowa 592;
Stricklan v. Burns, 14 Ala. 511; York v. Fortenbury,
15 Colo. 129; Bunnell v. Taintor's Admr., 5 Conn. 273;
Erwin v. Devine, 24 Ky. (1 J. J. Marsh ) 204; Davis v.
Caswell, 50 Me. 294; Detroit v. Houghton, 42 Mich. 549;
Jones v. Louderman, 39 Mo. 287; Leslie v. Railroad, 88
Mo. 50; Clements v. Yeates, 69 Mo. 623; Merle v. Has-
call, 10 Mo. 406; Beck v. Ferrara, 19 Mo. 30; Reed v.
Bott, 100 Mo. 62; Johnson-Brinkmann Co. v. Bank, 116
Mo. 558.   (4)   The proceeding for a lien was based on
an alleged contract by plaintiff with the "M., K. & T.
R. R. Co." and Graham and Miller jointly, while the
proof related to a contract with the railroad company
alone. This was fatal to the lien.   R. S. 1899, sec. 4241;
Mackler v. Railroad, 52 Mo. App. 516; Palmer v. La-
vigne, 37 Pac. 775; Krah v. Weidlich, 55 Mo. App. 536.
(5)   The petition and the "lien paper" only sought
to establish and enforce a lien on part of a railroad in
the State of Missouri, and omitted considerable and
important parts of the same railroad in this State,

which is not permitted under out statute. Dunn v. Railroad, 24 Mo. 493; McPheeters v. Bridge Co., 28 Mo. 467; Schulenberg v. Railroad, 67 Mo. 442; Cranston v. Railroad, 75 Mo. 29; Knapp v. Railroad, 74 Mo. 374; Ireland v. Railroad, 79 Mo. 572; Bethune v. Railroad, 149 Mo. 587. (6) The evidence shows that all of the ties in question were used on the railroad in Kansas and the Indian Territory, and none of them used on the railroad in Missouri. Under such circumstances the law does not give a lien. R. S. 1899, sec. 4239; O'Connor v. Railroad, 111 Mo. 185. (7) Instruction 2 was erroneous because it ignored the allegations of the petition, and authorized a recovery upon a contract made in the alternative with one or another of several different parties, and because the evidence did not warrant the instruction.

*John Boyle* and *J. L. Secor* for respondent; *J. H. Bothwell* and *C. E. Yeater* of counsel.

(1) The petition is sufficient. It sets forth definitely the facts showing the cause of action, and describes defendant's railroad and property as required by law. Giving the name of the railroad is sufficient. Granby, M. & S. Co. v. Davis, 156 Mo. 422; R. S. 1899, sec. 4241; Knapp v. Railroad, 74 Mo. 374; Bethune v. Railroad, 149 Mo. 604. But if facts were not as clearly set forth in the petition as they might have been, the cause is amply and definitely stated, and it is too late to raise objection now. The verdict cures it. R. S. 1899, sec. 722; Bank v. Leyser, 116 Mo. 51; Knox County v. Brown, 103 Mo. 223; McDermott v. Cleas, 104 Mo. 14; Lynch v. Railroad, 111 Mo. 601. (2) The "lien paper" met all the requirements of the statute, and, with the petition, properly seeks to enforce a lien on that part of the defendant's railroad which is in the State of Missouri. R. S. 1899, sec. 4241; Thompson v. Chappell, 91 Mo. App. 297; Railroad v. Ordelheide, 172

Mo. 436. (3) A lien may be enforced against a railroad company, on its property lying within this State, for material furnished the company, and used by it, on its property, out of this State. R. S. 1899, sec. 4239; Bridge Co. v. Railroad, 72 Mo. 664; Ireland v. Railroad, 79 Mo. 572. (4) This is an action at law, and the verdict of the jury is supported by substantial evidence. The finding of the jury, and judgment of the court thereon, is not subject to review in this court on questions of fact. Temple v. Railroad, 83 Mo. App. 64; Kuenzell v. Stevens, 155 Mo. 280; Carter v. Railroad, 156 Mo. 635; Steam S. C. C. v. Scott, 157 Mo. 520; Wolfe v. Supreme Lodge, 160 Mo. 675.

MARSHALL, J.—This is an action to recover a balance of $5,422.50, and interest, for ties delivered to the defendant at Wagoner Station, Indian Territory, and to establish a lien therefor on the defendant's railroad in Missouri. The plaintiff recovered a general judgment against the defendant, and was also awarded a lien on the railroad in Missouri, in the circuit court, and the defendant appealed.

The amended petition, upon which the case was tried, alleges that the plaintiff is a Missouri corporation and the defendant a Kansas corporation, doing business in Missouri, and that the other defendants, L. G. Graham and J. T. Miller, were partners under the firm name of Graham & Miller, and were the tie contractors of the defendant; that about April 20, 1899, the plaintiff entered into an agreement with the defendants to deliver to defendants fifty thousand oak railroad ties, at St. Louis, Sedalia and Wagoner, as the defendants might direct, for the price of forty-three cents for first class ties and thirty-three cents for culls; that plaintiff performed all the conditions thereof on its part; that the defendants have failed to perform their part of the agreement, in that, they have failed and refused to pay five thousand, four hundred and twenty-

two dollars and fifty cents, being a balance due for ties delivered to defendant, at Wagoner, under said agreement, between April and August, inclusive, 1899; "that defendant railroad company was at all of said times, and now is the owner of, and operating a line of railroad within the State of Missouri, to-wit, the railroad of the Missouri, Kansas and Texas Railroad Company, against which the lien hereinafter mentioned is intended to apply, all in said State of Missouri; thence into and across the State of Kansas, and into and across the Indian Territory, through the town of Wagoner in said territory, and into the State of Texas;" that within ninety days after the balance aforesaid became due the plaintiff filed a lien therefor in the office of the clerk of the circuit court of Pettis county, Missouri, setting out the items of the account, the property sought to be charged, and alleging "that defendant railroad company was the owner of said railroad and property, and the defendants, Graham & Miller, were the tie contractors of said railroad company," and that before filing said lien, to-wit, on October 26th, the plaintiff gave defendant notice of intention to file the same. The prayer of the petition is for a general judgment and for a lien.

Graham & Miller were made parties to the action, but were never served, and before the submission of the case, the suit was dismissed as to them.

The answer of the railroad company admits its incorporation, and the partnership of Graham & Miller, and that they were its tie contractors, and that between April and July the plaintiff delivered upon the line of its railroad at Wagoner 49,320 railroad ties; that it refused to pay plaintiff the balance of $5,422.50 claimed by it, and denies that it owes the same under any contract with the plaintiff; denies that the railway company, either jointly or severally with Graham & Miller entered into any contract with the plaintiff for said ties; alleges that Graham & Miller were its general tie

contractors, and that they entered into a contract with the plaintiff, the details, terms and conditions of which it does not know and with which it had no concern, to purchase ties; alleges that it agreed to pay Graham & Miller forty-three cents apiece for first-class ties, and seventeen cents apiece for culls, but denies any knowledge of what Graham & Miller agreed to pay the plaintiff; alleges that regular invoices of the ties delivered by Graham & Miller were rendered by them to the defendant each month, and that the defendant paid the same to Graham & Miller, or to their order, with the knowledge and acquiescence of the plaintiff; that the ties delivered each month were separate transactions and were paid for each month; alleges that at the request of Graham & Miller the defendant paid $8,949, freight and switching charges to other railroads for the carriage of the ties delivered at Wagoner; admits that on May 24, 1899, there was paid plaintiff on account of said ties the sum of $4,500, and on September 19, 1899, there was paid plaintiff the sum of $2,400, on account thereof, but denies that defendant made such payments and avers that they were made by Graham & Miller; alleges that plaintiff and Graham & Miller entered into some contract with reference to said ties, and avers that whether plaintiff was a subcontractor under Graham & Miller or a partner with them, the plaintiff does not know, but denies that in either event it became indebted to the plaintiff therefor; alleges the location and route of its railroad in Missouri to be as follows:

"Commencing at the city of Hannibal in the county of Marion, in the State of Missouri; thence extending in a southwesterly direction into and through the counties of Ralls, Monroe, Randolph and Howard to Franklin Junction in said last named county, and also commencing at Texas Junction, on the St. Louis, Keokuk and Northwestern Railway, in St. Charles county, Missouri, and extending westerly on the north side of the Missouri river into and through St. Charles, Warren, Montgom-

ery, Callaway, Boone and Howard counties to said Franklin Junction, and thence from said Franklin Junction through the counties of Cooper, Pettis, Henry, St. Clair, Bates and Vernon to the line between the States of Missouri and Kansas, and thence in a southerly direction into, and across the State of Kansas, and into and across the Indian Territory, to the line of the State of Texas, and also extending from a point in Pettis county known as Kansas City Junction, westerly through Pettis county and into and through Johnson and Cass counties to the line between the States of Missouri and Kansas, and thence westerly to the town of Paola, in the State of Kansas.''

This allegation of the answer was made in consequence of the allegations in the original petition and in the lien, which charged the location and route of the defendant's railroad to be as follows: ''From the city of Hannibal, in the county of Marion in said State, thence in a southwesterly direction into and through the counties of Marion, Ralls, Monroe, Randolph, Howard, Cooper, Pettis, Henry, St. Clair, Bates, Vernon, all in said State, thence into and across the State of Kansas and the Indian Territory and into the State of Texas.''

The difference between the two descriptions being that the original petition and the lien do not include the portions of the railroad in St. Charles, Warren, Montgomery, Callaway and Boone counties, and the Paola branch running through Pettis, Johnson and Cass counties.

The answer then admits the receipt of a notice on October 26, 1899, of intention to file a lien, but denies that it conforms to the law or has any legal effect; denies that the plaintiff served any notice or filed any lien or commenced a suit within the time required by law and denies that it is entitled to any lien.

The reply denied that the plaintiff knew or had any notice that the defendant paid Graham & Miller

for the ties delivered each month or that they had any arrangement so to do.

The circuit court rendered a general judgment against the defendant and adjudged it to be a prior lien ''upon the property mentioned in the petition, and described in the agreed statement set forth in the written stipulation filed in the cause, to-wit, the roadbed, station houses, depots, bridges, rolling stock, real estate and improvements of the defendant, Missouri, Kansas & Texas Railroad Company, in the State of Missouri; and that said lien be enforced against the Missouri, Kansas & Texas Railroad Company.''

At the trial the plaintiff first offered in evidence the lien. The defendant objected to the introduction of any evidence on the ground that the petition does not state facts sufficient to constitute a cause of action. The court overruled the objection and the defendant saved an exception. The defendant then objected to the introduction of the lien in evidence, on the ground that the description of the property as contained in the lien is entirely different from the description of the property described in the amended petition. The court overruled the objection, and the defendant saved an exception.

The plaintiff then read the lien, except the affidavit. The body of the lien recited that it was filed ''in order that it may constitute a lien upon the roadbed, station houses, depots, bridges, rolling stock, real estate and improvements of said Missouri, Kansas and Texas Railroad Company, or that portion thereof lying and being within the State of Missouri.'' The affidavit described the location and route of the railroad to be ''from the city of Hannibal in the county of Marion, in said State, thence in a southwesterly direction into and through the counties of Marion, Ralls, Monroe, Randolph, Howard, Cooper, Pettis, Henry, St. Clair, Bates and Vernon, all in said State, thence into and across

the State of Kansas and the Indian Territory into the State of Texas.''

When the plaintiff had read all of the lien except the affidavit, the defendant demanded that the plaintiff be required to read the whole paper. The plaintiff declined to read the affidavit, and therefore the defendant moved that the part the plaintiff had read be stricken out, as clearly insufficient under the statute. The plaintiff objected to reading the affidavit on the ground that no affidavit is required for a lien against a railroad. The defendant answered that such was not the only objection it made, and then read the affidavit and claimed that it was all a material part of one paper and that the plaintiff must read the whole of it, and that the part as read was not even signed by anyone. The plaintiff declined to read the remainder of the paper, saying it had read all it deemed necessary, and that the defendant could read the balance if it saw fit. The court held that the paper was in two parts and that the plaintiff was not required to read both parts, and, therefore, overruled the objection, and the defendant saved an exception.

The account set forth in the lien was headed: ''Missouri, Kansas and Texas Railroad Company, and Graham & Miller, tie contractors, of said Railroad Company, to the Bagnell Timber Company,'' etc.

The plaintiff then read in evidence the notice of intention to file a lien, dated October 25, 1899, and served on the defendant by the sheriff of the city of St. Louis, October 26, 1899, which was directed, ''To the Missouri, Kansas and Texas Railroad Company, St. Louis, Missouri,'' and the account therein contained was headed, like the heading of the lien above set out.

The plaintiff then read in evidence the following agreed statement of facts:

''It is hereby stipulated and agreed by and between the plaintiff, the Bagnell Timber Company, and the defendant Missouri, Kansas & Texas Railway Company,

hereby admitted to be the same corporation designated in said cause as Missouri, Kansas and Texas Railroad Company, that the following matter shall be agreed upon as facts, and shall be admitted and taken as established for the purposes of the trial of this case:

"1.   It is admitted that the plaintiff is a corporation organized and existing under the laws of the State of Missouri.

"2.   The defendant, Missouri, Kansas & Texas Railway Company, is a corporation organized and existing under the laws of the State of Kansas, and doing business in the State of Missouri.

"3.   That the defendant, Missouri, Kansas & Texas Railway Company now owns and operates a continuous line of railroad commencing at the city of Hannibal, in the county of Marion, in the State of Missouri, thence extending in a southwestwardly direction into and through the counties of Ralls, Monroe, Randolph and Howard to Franklin Junction in said last named county, and also commencing at Texas Junction, on the St. Louis, Keokuk and Northwestern Railway, in St. Charles county, Missouri, and extending westerly on the north side of the Missouri river into and through St. Charles, Warren, Montgomery, Callaway, Boone and Howard counties, to said Franklin Junction through said Howard county, into and through the counties of Cooper, Pettis, Henry, St. Clair, Bates and Vernon to the line between the States of Missouri and Kansas, and thence in a southerly direction into and across the State of Kansas, and into and across the Indian Territory, to the line of the State of Texas, and also extending from a point in Pettis county, known as Kansas City Junction, westerly through Pettis county into and through Johnson and Cass counties to the line between the States of Missouri and Kansas, and thence westerly to the town of Paola, in the State of Kansas, and that said road passes through the town and station of Wagoner, in the Indian Territory, and that said defendant

did so own and operate the railroad as above described throughout the whole year of 1899.

"4. That during the year 1899 the defendants Graham & Miller were the tie contractors of the said defendant Missouri, Kansas & Texas Railway Company.

"5. That during the months of April, May, June, July and August, 1899, the plaintiff company delivered 49,320 railroad ties on defendant's railroad track at Wagoner, in the Indian Territory; that five of said ties were culls and the remainder were first-class.

"6. That all of said ties were used by defendant in and upon its said railroad, a part of them being used in the Indian Territory, but much the greater part being used upon the tracks of the defendant Missouri, Kansas & Texas Railway Company in the State of Kansas.

"7. That said ties were shipped from sundry points on the St. Louis, Iron Mountain and Southern Railroad in the State of Arkansas and over other lines of railroad constituting part of the Missouri Pacific system, and being entirely independent and distinct from the railroad of the defendant Missouri, Kansas and Texas Railway Company, and that said defendant paid to said other railroad lines freight charges on said ties at the rate of 18 cents per tie, and also paid certain switching charges, all of said charges amounting in the aggregate, as plaintiff claims, to $8,884.60, but said defendant claims a further payment of $15.85.

"That on the 26th day of October, 1899, the defendant Missouri, Kansas & Texas Railway Company received from the plaintiff a notice to the effect that said plaintiff asserted that it held a claim against said defendant railroad company for ties to the number aforesaid furnished and delivered to said railroad company under and pursuant to a contract with said company and Graham & Miller, and that the said plaintiff

claimed a net balance due on account of said ties in the sum of $5,422.50 after all just credits had been given, and farther notifying said railway company that it proposed on the 27th of October, 1899, to file in the office of the clerk of the circuit court of Pettis county, in the State of Missouri, a lien upon the roadbed, station houses, depots, bridges, rolling stock, real estate and improvements of said Missouri, Kansas & Texas Railway Company, or that portion thereof lying and being within the State of Missouri, to enforce said claim.

"8.   It is further stipulated and agreed that nothing herein contained shall be construed as committing either party to any admission concerning the nature of the contract under which said ties were furnished and delivered by the plaintiff at said Wagoner station as aforesaid, the plaintiff claiming that the said ties were sold by it to the defendant Missouri, Kansas and Texas Railway Company, as designated in the caption of said cause, and the defendant railway company denying any purchase of said ties by it from the plaintiff, and claiming that the ties were furnished and delivered by the plaintiff under some contract or agreement between said plaintiff and Graham & Miller, tie contractors of said defendant railroad company, to which this defendant railway company was not a party, it being the purpose and intention of the parties in making this stipulation to leave the question of the nature of the contract and the relation of the several parties thereto open for such proof as either party may offer.

"9.   It is further agreed that notwithstanding the admission of facts as above set forth, either party is at liberty to offer any further evidence that may be desired, and which either party may consider proper in order to more fully advise the court of the details of said transactions."

It was then admitted in open court, by the plaintiff, that the defendant's claim for the further payment

of $15.85 for charges set forth in paragraph seven of the stipulation, is a correct claim and should be credited.

The plaintiff then introduced the deposition of J. T. Miller, of South McAlester, Indian Territory, in which he testified that during the year 1899, and for two or three years previous thereto, Graham & Miller, were the tie contractors for the defendant; that because of the act of Congress, known as the Curtis Bill, they were prohibited from cutting ties in the Indian Territory, and that Captain Stevens, the defendant's purchasing agent, told him to go and see the plaintiff, and to try to buy the ties from it; that Mr. Allen, the defendant's general manager, wanted him to get ties from the Osage river, which he knew was the plaintiff's territory; that he sent a man into that territory to buy ties; that Mr. Allen instructed him to see plaintiff and to try and buy fifty thousand ties; that he saw Mr. Bagnell, the president of the plaintiff company, and he agreed to sell him twenty-five thousand ties; that he reported to Stevens and Allen, and the latter said it was a mere bagatelle, and that he must have fifty thousand; that he reported this to Bagnell and "he said he would try to arrange so the company could get 50,000 ties at Wagoner, I. T., with the understanding that the company and ourselves would sign an agreement to keep out of that territory;" that Bagnell wanted forty-five cents apiece for them; that they "dickered on the price for several days," and finally Bagnell said, "rather than to have any trouble and to have our people go into their territory he would deliver 50,000 ties, I. T., for 43 cents. I quoted the matter to Captain Stevens and he told me to close it in that way; that the ties were shipped, but that Graham & Miller never gave any orders for them; that the general contract of Graham & Miller with the defendant was for thirty-seven cents per tie on the line and thirty-eight cents free on board." He then testified as follows:

"Q. What connection have you with the sale of these ties with the Bagnell Timber Company? A. Well, I was a kind of a go-between. Q. What do you mean? A. Well, I mean this, Mr. Bagnell would never have sold the ties had not the railroad company agreed to keep out of that territory, the Osage territory. At least, that is what Mr. Bagnell said. He did not have them and did not want to sell them. I believe it was his own statement. Q. That is a kind of courtesy between railroads on the territory in which they make their purchases? A. I think so."

The witness further testified that the ties were billed, "M. K. & T." and "Graham & Miller," but that none of the invoices were sent to him, but that he got them from the railroad company.

He further testified as follows:

"Q. Mr. Miller, you stated you regarded yourself as a 'go-between.' Please define your position in the matter at the time you had this transaction with the Bagnell Timber Company? A. I mean that Mr. Bagnell refused to let the company have the 50,000 ties, and that the company forced Graham & Miller to go into the Bagnell territory, or to have some one else in there to buy ties. The fact is, that Mr. Allen said to me, that if he did not get 50,000 ties he would put men in there to get them. I felt that there was no profit in that as I did not get a cent out of it. So it seemed that Bagnell was forced into this deal. That is the way I felt about it.

"Q. What was the final arrangement made with you by the Bagnell Timber Company for these ties? A. I don't fully understand what you mean.

"Q. You say you was a 'go-between.' What was the closing up of the deal? A. So far as I know, Mr. Bagnell gave me a letter which was to be handed to Captain Stevens, and a letter returned from Captain Stevens to the Bagnell Timber Company.

"Q. Did you return the letter to the Bagnell Tim-

ber Company? A. I am not certain whether I did so. I am of the impression that I did.

"Q. That ended your interest in the matter? A. That ended my connection, except the billing afterwards as stated."

He further testified on cross-examination that the usual method of doing business was for the tie contractors to make out an invoice of the ties delivered each month, which would be checked up with the report of the inspector and then the contractor would get his money. The letter which the witness referred to was then shown to the witness (being the letter of April 19th, hereinafter set out) and he identified it, except the postscript thereto, which he said he never saw before, and the witness said the word "have" had been changed to the word "may" since he delivered it, adding, "I don't remember about any change at all, for I am sure that the price was agreed upon before the letter was written, at least that is my recollection."

The witness further testified that he made the payments of $4,500 on May 24th, and of $2,400 on September 19th, to the plaintiff, by his check in favor of the plaintiff. He further said his feeling toward the defendant was unfriendly because it owed him money, and that he had never demanded a settlement from the company, but was about ready to do so.

The plaintiff then read in evidence a copy of articles of incorporation of the Missouri, Kansas & Texas Railroad Company, which was certified by the Secretary of State of Kansas on January 17th, as having been filed in his office on December 30, 1869, and was certified by the Secretary of Missouri on October 17, 1900, as having been filed in his office, which showed that certain persons associated themselves together on December 23, 1869, under the name of the Missouri, Kansas & Texas Railroad Company, and that the purpose for which the company was formed was "the construction and operating of a railroad from a point on

the State line of Kansas and Missouri where the Ft. Scott branch of the Tebo and Neosho Railroad of Missouri intersects the same, in a westerly or southwesterly direction, through the city of Fort Scott, to a point on the southern or western boundary of the State of Kansas, near the southwest corner thereof, through the counties of Bourbon, Allen, Neosho, Woodson, Wilson, Greenwood, Howard, Cowley, Sumner, Harper, Barber, Comanche and Clark, an estimated distance of three hundred and fifty miles,'' and the principal office of the company was to be located in Ft. Scott, Kansas.

The plaintiff then called as a witness William Bagnell, who testified that he is and during 1899 was the president of the plaintiff company; that he is the tie contractor for the Missouri Pacific railroad; that in 1899 he had several talks with Stevens and also with Miller, about selling ties, and told them he had no ties for sale. In reply to a ruling of the court that he could state any conversation he had with Stevens not only as to the agreement he had with him, but also as to anything that occurred between him and Miller prior to that, the witness said:

''A.   I had a conversation with Mr. Stevens, as I have stated, in relation to ties, to the purchase of ties, and he said to me, 'Bagnell, the company wants ties,' and I said, 'I haven't got them to spare.' Later on I met him again, and he asked me about ties, and I told him that, at least he says, 'Now Bagnell, you have offered us ties, delivered at Wagoner at thirty-eight or thirty-nine cents,' I said, 'Yes, Captain, but that was a year ago and things have changed now and I can't furnish them to you at that price.' I says, 'The price I want now is forty-five cents.' Captain Stevens then said to me, 'Bagnell, make me a price f. o. b. cars at point of loading and I will see the Missouri Pacific Railroad and arrange the freight.' I considered that a few minutes and said, 'No, but I'll tell you what I'll do, I'll

make you a price of forty-three cents f. o. b. cars Wagoner.' He said, 'That's all right.'"

The witness further testified he got a letter from Stevens sent by the hands of Miller, and identified the letter testified to by Miller, as a part of the letter he referred to. He said the letter was delivered to him at his office in the Equitable building, and that after he received it, he took it and went to Stevens's office, and told Stevens he objected to it because it stated that the ties were sold "at a price which you *have* agreed on with Messrs. Graham & Miller," whereas, no price had been agreed upon at that time, and no agreement to sell ties had been made by his company at that time, and that in consequence of his objection Stevens struck out the word "have" in the letter and interlined the word "may" above it; that he afterwards went with Mr. Meyer, the secretary of the plaintiff company, to see Stevens, and because of some prior experience his company had had with the defendant company growing out of the rigid inspection which the defendant company made of ties, he and Meyer insisted upon Stevens adding the P. S. to the letter, which as thus changed and added to was as follows:

"MISSOURI, KANSAS & TEXAS RAILWAY SYSTEM.

"Office of Purchasing Agent,
"Wainwright Building.

"C. N. Stevens,
    "Purchasing Agent.

"St. Louis, Mo., April 19, 1899.
"Bagnell Tie and Timber Co., City.

"Gentlemen: In consideration of your agreeing to let our tie contractors, Messrs. Graham & Miller, have 50,000 oak ties within a reasonable time not to exceed say six weeks, one-third of which can be delivered either St. Louis or Sedalia, our tracks, the balance to be delivered to Wagoner, I. T., our tracks, ten per cent

of which amount, viz, five thousand, may be, if you de-
sire, sawed oak, to be in accordance with our specifica-
tions otherwise, and at a price which you ~~have~~ <sup>may</sup> agree on
with Messrs. Graham & Miller; we, in turn, agreeing
that any contractors who are working for us this year
(1899) shall refrain from entering into or shipping any
ties from your natural territory, that is, on the east
side of the Missouri river, and not to employ any agent
on our part to move ties from your territory.

"Yours truly,

"C. N. STEVENS,

"Purchasing Agent.

"P. S.   It is understood in addition to above that
we will give a liberal inspection on all of the ties; we
mean by that, as liberal as other systems which are buy-
ing ties from you.   Should you be obliged to stop our
inspectors on their work, it is agreed that it shall be
without expense to you.   It is also agreed that instead
of delivery being made for the entire fifty thousand
(50,000) in six (6) weeks that the minimum quantity
to be loaded per week shall be five thousand (5,000.)

"C. N. S."

He further testified that he had no further talk
with Stevens, but that he sent the inspectors down and
Meyer went down and the delivery of the ties began;
that the bills for the ties were made out and mailed to
M. K. & T. Railway, Graham & Miller, in care of Cap-
tain Stevens; that after Miller delivered Stevens's let-
ter to him on April 19th, he did not see him any more,
and he had nothing further to do with him, with refer-
ence to the contract, but that all the business in reference
to the formation of the contract and the conduct of the
business was thereafter had with the "M. K. & T.;"
that all the money his company received under this
contract was by checks of Graham & Miller; that the
railroad company paid the freight bills; that in trying
to collect pay for the ties he went to see Stevens and

told him he had not been paid and asked permission to go and see Mr. Allen, the defendant's general manager, which Stevens granted, and he saw Allen and told him he had not been paid and Allen said he would look into it, and on that or the following day he got the check of Graham & Miller for $2,400.

On cross-examination he said that the talk he had with Stevens in which he agreed to deliver the ties at Wagoner, for forty-three cents each, took place *after* the letter of April 19th, aforesaid, had been changed and added to as aforesaid; that until he received that letter he refused to sell to either Graham & Miller or to the railroad; that the only contract he had for the sale of the ties was made with the M. K. & T. through Stevens. The witness was then asked and answered as follows:

"Q. Was that contract verbal or written? A. That letter you have there from Captain Stevens and with the understanding and talk I had with Captain Stevens makes the contract.

"Q. And you have given all that talk and conversation? A. Yes, sir, I think so.

"Q. Wherein you referred to the propositions that passed about delivering on board the cars at point of loading, etc.? A. Yes, sir.

"Q. That is the conversation you refer to? A. Yes, sir.

"Q. That with this written paper makes up the contract? A. Yes, sir.

"Q. Was there anybody else present on the other side?—I mean speaking of your company on one side and Captain Stevens on the other—when that contract was made? A. I don't know whether there was anybody in there or not, I don't recollect whether there was anybody else present. I had several talks with Miller and he claimed to have been sent by Captain Stevens.

"Q. What did Miller have to do with it? A. I don't know.

"Q. I understand you claim to have sold the ties

to Captain Stevens as purchasing agent? A. I claim to have sold the ties to the M. K. & T. and Graham & Miller.

"Q. Do you remember on two occasions, first, to General Boyle and then on cross-examination, you said that conversation and this written letter is your contract? A. Yes, sir.

"Q. In your narration of that conversation, which you claim constitutes the contract, you didn't mention Miller? A. I said I wouldn't sell Graham & Miller ties.

"Q. At all? A. No, sir, at all, because they were borrowing money to do their business, and I frankly refused to sell them ties individually. With the M. K. & T. back of them I made my agreement.

"Q. With whom? A. With Captain Stevens, as I have stated.

"Q. To sell to whom? A. To the M. K. & T., as I have stated.

"Q. And in that conversation there wasn't any talk about selling to Graham & Miller at all? A. I wouldn't sell to Graham & Miller individually.

"Q. Your contract was to sell to the M. K. & T. individually. A. He was a go-between, as he states, to find out what I would do. I don't know his connection with Mr. Stevens, but I wouldn't sell Graham & Miller as individuals.

"Q. The contract as you wanted it was between your company and the M. K. & T? A. That's the way I understand it. While Graham & Miller were still working, Miller would say, 'Captain Stevens has sent me over here to find out what you would do.'

"Q. You regarded him as a messenger? A. I don't know what to regard him. I have stopped regarding him. I don't know what place he belongs.

"Q. Did you ever tell anybody before that you had stopped selling to Graham & Miller? A. I don't

think I would try to injure their credit in that way, because I had a good deal of respect for them.

"Q. What relation did they occupy toward the M. K. & T? A. They were tie contractors.

"Q. Occupied the same relation toward the M. K. & T. that your company did with the Missouri Pacific? A. Yes, sir.

"Q. And you knew that all the time? A. I don't know when Mr. Hussey bought them out, but it was along some time early in the spring.

"Q. Did Mr. Hussey buy them out? A. I think so. I got that information in some way.

"Q. I am talking about the time the contract was made? A. How is that?

"Q. Didn't you know they were tie contractors for the M. K. & T. railroad? A. Yes, sir.

"Q. And when they were coming to you talking about getting ties, you knew that was their relation to the railroad? A. Yes, sir."

He further testified that the ties were gotten and shipped from Arkansas to the Indian Territory. Thereafter on further cross-examination the witness was asked and answered as follows:

"Q. Mr. Bagnell, will you explain this entry of these ties? Why the words 'Graham & Miller,' were written there as they are? A. Well, why the words, 'Graham & Miller,' is written as they are because that is the way the transaction was made.

"Q. With Graham & Miller? A. M., K. & T., Graham & Miller.

"Q. Was your system when you sold to railroad companies to put the name of any other parties on your books? A. When there were two interested or more in the transaction.

"Q. Didn't you tell us yesterday, repeatedly, that this was a contract solely with the Missouri, Kansas & Texas Railway Company? A. I don't think I did.

"Q. You don't think you said that? A. I don't think I did.

"Q. What do you say now? A. I say that the ties were sold to the Missouri, Kansas & Texas Railroad, Graham & Miller.

"Q. Missouri, Kansas & Texas Railroad, Graham & Miller. I want to direct your attention, in order that we may have no misunderstanding; didn't you say yesterday that the only contract consisted of what was represented in this letter of April 19th and the conversation you had with Mr. Stevens, which you related? A. I think I said that in connection with other things. I think I said that if you will allow me to explain it.

"Q. You think you said that? A. I know I did. I said it in this way: You had a great many questions up for me to answer, and I said it in this way, that that letter and the conversation that I had with Mr. Stevens made the agreement with the M. K. & T., Graham & Miller, or Mr. Miller worked in between Captain Stevens and me and between Mr. Allen and me, and how he figured in it, whether he was their agent or for whom I don't know.

"Q. Didn't you tell this jury a half a dozen times that Graham & Miller had nothing to do with this contract? A. I don't think I did.

"Q. What did they have to do with it? A. As I said, Miller would come to me and he would say, 'I am here from Captain Stevens. He has sent me over to let them know what you are going to do in the way of letting them have some ties.'

"Q. Is that all he had to do with it? A. Oh, well, in a way there were several other things, but that was about the amount of his business with me.

"Q. Mr. Bagnell, don't you understand what I am getting at? I am not asking you what Mr. Miller may have said as agent of the railroad company or anything of the kind. I am asking you what interest, if any, he had in this contract? A. I don't know what

interest he had.   He would come to my office and say, 'Captain Stevens has sent me over' ——

"Q.   I don't care for you to repeat that conversation.   I am not asking you about any word he may have brought to you, but when you made the contract with Captain Stevens in which you say in substance that he asked you to name to him (Stevens) as the purchasing agent of the company a price f. o. b. at point of loading.   A.   Yes, sir.

"Q.   And he would arrange the freight?   A. Yes, sir.

"Q.   You considered it a few moments and declined to do that and said you would give him a rate of forty-three cents f. o. b. Wagoner?   A.   Yes, sir.

"Q.   And thereupon you considered the transaction closed with Captain Stevens and he alone, didn't you?   A.   That part of it closed with Mr. Stevens.

"Q.   What did anybody else have to do with it? A.   Miller would come to me before this time and state to me—

"Q.   As a man that sells millions of ties every year, can't you tell this jury whether you thought you were dealing with Graham & Miller as parties to that contract?   A. I was dealing with the M. K. & T. Railroad, Graham & Miller."

In explanation of the phraseology of the letter of April 19th, in which it is stated that the plaintiff was to let Graham & Miller have the ties, the witness testified as follows:

"Q.   (By Mr. Jackson):   I will ask you to explain to the jury, if you were making a contract to sell direct to the railroad company, why you had the conversations and negotiations that you have testified to with Captain Stevens about this letter?   A.   The contract and negotiation was made between the M., K. & T., Graham & Miller, both of them.   In the first place, individually, I wouldn't have sold Miller ties and  .  .  .

"Q.  (By Mr. Jackson):  Why, if you understood that you were making a contract with the M., K. & T. railroad company and that this letter was to be part of the evidence of your contract, did you permit this expression to be used, 'in consideration of your agreeing to let Graham & Miller, our tie contractors, have fifty thousand ties,' etc.; why did you consent to that language?  A.  That letter is from Mr. Stevens to The Bagnell Timber Company, isn't it?

"Q.  Yes, sir.  A.  That was an outline of an agreement beforehand that they would keep out of there, and the M., K. & T. was needing ties badly and it must have them and couldn't wait to have them manufactured in that territory.

"Q.  Didn't you understand at the time that this referred to an agreement that you were making with Graham & Miller to let them have the ties?  A.  No, sir; not individually.

"Q.  You took the precaution to have a word changed in here?  A.  Yes, sir; it shows for itself.

"Q.  You insisted on it?  A.  Yes, sir.

"Q.  Why didn't you insist on having a change made to show that you were selling the ties direct to the M., K. T.?  A.  I have related the facts.

"Q.  Can you give any reason why you did not do that?

"Mr. Yeater: The testimony is undisputed that he has testified that the contract was entered into after he made that change in the letter.

"The Court:  I do not understand that Mr. Bagnell has answered Mr. Jackson's last question if he understood he was dealing direct with the M., K. & T., making contract direct with them, why he did not change that part of the contract.

"Mr. Yeater:  You mean that letter?

"The Court: Yes, sir.  Answer the question.

"Q.  (By Mr. Jackson): Answer, if you can, why when you were making changes in the wording of

this letter you did not insist that there should be some change made in that statement, 'in consideration of your agreeing to let our tie contractors, Messrs. Graham & Miller, have fifty thousand oak ties,' etc., they would keep out of your territory. Why didn't you insist on some change there? A. I think I have explained that by stating the facts of the sale of the ties, how Miller worked between Captain Stevens and myself, and as to why I didn't have it all changed I don't know why I didn't have it all changed.''

The witness identified a letter written by plaintiff's secretary on October 4, 1899, to Stevens, inclosing a copy of a letter witness wrote Graham & Miller on September 28, 1899, which was as follows:

''Messrs. Graham & Miller,
    ''Care Gleason Hotel,
        ''Little Rock, Ark.,
''Gentlemen: We hereby serve notice on you that if the balance of the account on ties delivered to the M., K. & T. R'y is not fully paid by Oct. 9th, that we will file a lien on the M., K. & T. R'y on that day, and we wish you would have the kindness to make this settlement so as to avoid this trouble and expense.

''Yours truly,
    ''WILLIAM BAGNELL,
        ''President.''

The witness also identified a notice, dated October 21, 1899, signed by himself as president of the plaintiff company, of intention to file a lien, the heading of which was as follows:

''*To the Missouri, Kansas and Texas Railroad Company, St. Louis, Missouri*:

''Take notice, that we hold a claim against the Missouri, Kansas and Texas Railroad Company, for railroad ties furnished and delivered to said railroad company, under and pursuant to a contract with Graham &

Miller, tie contractors of said railroad company, as shown by the following account, to-wit.''

Then follows the itemized account, showing a delivery of 49,320 ties furnished, ''under contract with Graham & Miller, to the Missouri, Kansas and Texas Railroad Company and delivered to L. W. Welsh, superintendent, at and upon the tracks of said railroad company at Wagoner, in the Indian Territory,'' etc.

In explanation of the discrepancy between the fifty thousand ties contracted to be delivered, and the ties actually delivered, the witness testified that there was an understanding that whatever ties the defendant or Graham & Miller had bought that came off of the Gasconade or Osage rivers, should apply on this contract, and that they got about seven or eight hundred of them. (The subsequent testimony of Hussey, the foreman for Graham & Miller, shows that there were 680 ties so bought, which covers the deficit.)

C. E. Meyer, the plaintiff's secretary, testified, but as he knew nothing of the contract, and only spoke of the manner of keeping the account upon the plaintiff's books, it is not necessary to digest his testimony.

John Boyle, plaintiff's attorney, testified that he prepared the notice of intention to file a lien dated October 21st, but finding it incorrect he prepared the other notice which the sheriff served, which treated the contract as a joint contract with the railroad company and Graham & Miller.

This was all the evidence on the part of the plaintiff.

The defendant demurred to the evidence and asked the court to declare that the plaintiff was not entitled to a judgment upon the contract or for a lien.   The court refused so to do, and the defendant saved an exception. The defendant then by separate instructions asked the court to declare that the plaintiff was not entitled to recover upon the contract or for a lien.   The court refused so to do, and the defendant saved an exception.

The defendant then introduced the following testimony:

C. N. Stevens, the purchasing agent for the defendant, testified as to the difficulty in getting ties in the Indian Territory, and to the plaintiff's repeated refusal to sell ties to the defendant and to Graham & Miller, and as to the order to Graham & Miller to go into the Gasconade and Osage territory and buy or cut ties, and then said that he learned that the plaintiff would sell ties at forty-three cents and that as the defendant's contract with Graham & Miller was only for thirty-eight cents, he went to Bagnell and said, "Mr. Bagnell, throw these parties Graham & Miller aside, and deal with us direct; we are getting in a hurry for these ties." To which Bagnell replied: "Mr. Stevens, I can't do it; we have arrangements with Mr. Miller and I can't throw them over, and I must deal with Graham & Miller."

The witness then testified that defendant agreed to advance the price to Graham & Miller from thirty-eight to forty-three cents, so that Graham & Miller could deal with the plaintiff, and that he heard nothing more about the matter until April 19th, when Bagnell came to his office and said to him, "We have made arrangements for those ties, Captain, and now, there is just one thing we must fix about this, you know there has been considerable talk about Graham & Miller invading our territory, and it is only right, Captain, that you folks should fix this for me in a way that you will guarantee that your contractors won't go into our territory." I replied, "Very well, Mr. Bagnell, we will fix that right now," and that he dictated the letter of April 19th. When it was copied and read to Bagnell and he noticed that it read, "at the price which you have agreed on with Messrs. Graham & Miller," he said, "Captain, I haven't agreed yet, and you ought to put that word 'may' instead of 'have.'" Thereupon he made the change. Then a question was raised about the inspection, and he added the postscript.

In substance this witness testified that this was all the dealings he had with Bagnell about the contract; that the ties were furnished, being shipped from Arkansas to Wagner and used in the Indian Territory and in Kansas; that the company never received but one invoice, which was forwarded to Graham & Miller; that the company paid the freight charges at the request of Graham & Miller; that plaintiff never demanded any money from defendant, but complained that he was not getting his pay from Graham & Miller, and at its request he wrote and telegraphed Graham & Miller and urged them to pay plaintiff, to which they replied that they were trying to sell some securities and would be in St. Louis by a certain date and would settle with plaintiff, and that he forwarded the same to Bagnell for his information, and he returned it, thanking him for the same; that on one occasion when Bagnell spoke to him about it he told him there was a voucher passing through the defendant's office that day in favor of Graham & Miller for twenty-five hundred dollars, growing out of another matter, and he would see the treasurer and try to get him to persuade Graham & Miller to let it be applied on plaintiff's claim; that later Bagnell came to him and said, "Mr. Stevens, I don't care so much about the money now, but I do feel as if I ought to be secured in some way by Graham & Miller. I would be willing to wait a year, any length of time that was reasonable, if they could only give me some kind of security."

During the examination of this witness the court permitted the defendant to show that it had paid Graham & Miller in full for the ties, but refused to allow it to show that they paid them at the end of each month for the ties delivered during that month, to which ruling the defendant saved an exception.

The defendant then introduced the deposition of A. A. Allen, the vice president and general manager of

the defendant, who testified that he never authorized Miller or anyone else to purchase ties for the defendant from the plaintiff, and that he was the only one who had authority to bind the defendant for purchases in that way; that all his communications and transactions with Graham & Miller were in their relation of tie contractors with the defendant, and that it was in that character that he told them to go to the plaintiff and see if they could not get ties.

Robert W. Maguire testified that he was defendant's treasurer; that on one occasion in September, 1899, a voucher for twenty-five hundred dollars was passing through his office in favor of Graham & Miller, and that Captain Stevens and Miller came in and Stevens made a statement, the nature of which the court would not permit the witness to state, in which Miller acquiesced, and in consequence the witness's chief clerk drew a check in favor of plaintiff for $2,400, and Miller signed it, ''Graham & Miller,'' and handed it to Hussey to be delivered.

D. D. Hussey testified that he was foreman for Graham & Miller; that they could not get ties in the Indian Territory, and that by direction of Graham & Miller he went into the Osage river territory and got eight or ten thousand ties, and was then stopped; that representing Graham & Miller he had tried to buy ties from plaintiff but had failed; that about April Bagnell told him to tell Graham & Miller plaintiff was ready to sell them ties, and he and Miller went to see Bagnell about it; that at first Bagnell said he would sell 15,000 to 25,000 ties; that they reported it to Mr. Allen and afterwards they saw Bagnell and asked him to make it 50,000 ties, and Bagnell agreed to do so, on condition that Graham & Miller would keep out of the plaintiff's territory; that this was about three o'clock in the afternoon of April 18 or 19, 1899; that he was not present when the price was agreed on; that 680 ties that had

been bought in plaintiff's territory were deducted from the fifty thousand contracted for.

At the request of the plaintiff, the court gave seven instructions. The first authorized a general judgment against the defendant if the jury found the ties were furnished under a contract between the plaintiff and the Missouri, Kansas & Texas Railroad Company and Graham & Miller. The second authorized a lien against the railroad if the plaintiff furnished and delivered the ties to the railroad, "provided such ties were furnished under and in pursuance of one contract with such railroad company or its agents or its tie contractors," and if the statutory steps for securing a lien were taken. The third instructed the jury that the delivery of the ties and the balance due were admitted, "and if the jury found from all the facts and circumstances before them that the ties were delivered under a contract of sale made by plaintiff with the Missouri, Kansas and Texas Railroad Company and Graham & Miller," they should return a verdict for the plaintiff. The fourth told the jury that they were not bound by any *statement* or expressed conclusion of Allen or Stevens, that they did not make any agreement with plaintiff to sell the ties to the railroad and Graham & Miller, and did not authorize Miller to make any contract with the plaintiff for the railroad company, but that the jury should determine the question "of whether the contract was made and by and through whom it was made from all the facts and circumstances and evidence." The fifth instructed the jury that the corporate name of the defendant had been proved to be "Missouri, Kansas & Texas Railroad Company," and that the use of that name in the pleadings, notice and lien was "a sufficient description of the property intended to be charged with the lien." The sixth instructed the jury that the accidental omission in the account, petition and other papers of the $15.85 was not an intentional failure to give full credits, and had no effect upon the plaintiff's right to a lien. The

seventh simply told the jury that the plaintiff had dismissed the suit as to Graham & Miller and hence there could be no verdict against them.

The defendant duly saved exceptions to the giving of these instructions.

At the request of the defendant the court instructed the jury that the plaintiff sued the defendant upon the theory that the contract was a joint one by the defendant and Graham & Miller, and unless the jury found that it was a joint contract, or if the jury found that the contract was with Graham & Miller, the general contractors, their verdict must be for the defendant on the contract. Upon the question of the right of the plaintiff to a lien the defendant requested the court to instruct the jury as follows:

"8. The court further instructs you that in this case the plaintiff has sued on the theory that the ties in question were sold by plaintiff directly to the defendants, Missouri, Kansas and Texas Railway Company and the firm of Graham & Miller, jointly, as a direct transaction between the plaintiff and the said defendant, Missouri, Kansas & Texas Railway Company, and that the plaintiff is entitled to a lien against the railroad described in the petition as an original contractor or materialman, and the plaintiff is not entitled to enforce a lien upon any other theory, and if you believe from the evidence that the ties in question were sold by the plantiff as a subcontractor, to Graham & Miller as the general tie contractors of the Missouri, Kansas & Texas Railway Company, to be furnished to the said railway company under the general contract between it and said Graham & Miller, then the plaintiff was a subcontractor under Graham & Miller and only entitled to a lien as such, and can not enforce a lien, upon the theory of being an original contractor, to secure the payment of any amounts remaining due it as a subcontractor."

The court refused to so instruct the jury, and the defendant saved an exception. There was no instruc-

tion asked or given for either side which covered the point presented by this instruction.

The jury returned a general verdict for the plaintiff and also found that it was entitled to a lien, and the court entered a personal judgment against the defendant and declared it to be a lien in the form and manner hereinbefore set out. After proper steps the defendant appealed.

## I.

The first question that presents itself for adjudication in this case is the right of the plaintiff to a lien upon the defendant's road in Missouri.

The lien describes the railroad of the defendant upon which a lien is claimed to be "from the city of Hannibal in the county of Marion in said State" (Missouri) "thence in a southwestwardly direction into and through the counties of Marion, Ralls, Monroe, Randolph, Howard, Cooper, Pettis, Henry, St. Clair, Bates and Vernon, all in said State, thence into and across the State of Kansas and the Indian Territory and into the State of Texas; that the foregoing description is a true description of the property of said railroad company upon, to and for which said ties were furnished and to which this lien is intended to apply, or so near as to identify the same."

The original and amended petition alleged that the defendant owned a certain railroad and then and there described it substantially the same as said description in the lien, and then alleged the filing of the lien showing the account, materials furnished, "and giving a description of the property to be charged with such lien, to-wit, the railroad aforesaid, and the improvements thereon, and therewith connected, including the roadbed, station houses, depots, bridges, rolling stock, real estate and other improvements thereof," and asked judgment for the sum claimed, "and that the same be declared a lien against the railroad and property above described."

By leave to amend the petition by interlineation the plaintiff amended the amended petition so as to leave out the particular description of the route and location of the railroad owned by the defendant and upon which a lien was sought to be charged, and left it to read as follows: "that defendant railroad company was at all of said times, and now is the owner of, and operating a line of railroad within the State of Missouri, to-wit, the railroad of the Missouri, Kansas and Texas Railroad Company against which the lien hereinafter mentioned is intended to apply, all in the State of Missouri, thence into and across the State of Kansas and into and across the Indian Territory, through the town of Wagoner in said territory, and into the State of Texas," and left the allegation above quoted as to the description in the lien of the property sought to be charged, and also left the prayer for judgment and lien the same.

Having thus changed the allegations of the petition from a specific description to a general one, the plaintiff at the trial sought to get rid of the specific allegations of the lien as to the property sought to be charged with the lien, by omitting to read the part of the lien which contained such specific description. The defendant objected to the omission thereof, and asked that the part read be stricken out unless the plaintiff read the whole of it. The plaintiff replied that it had read so much of it as it wanted, and the defendant could read the balance if it wanted to, and that the part omitted consisted of the affidavit to the lien, and that a railroad lien was not required to be verified by the statute, and therefore it was not obliged to read it. The court ruled that the paper was in two parts, and that the plaintiff was not obliged to read both parts. The defendant assigns this ruling as error.

It is true that section 4241, Revised Statutes 1899, providing for the filing of a railroad lien does not ex-

pressly require that it shall be verified, as section 4207, Revised Statutes 1899, does as to mechanics' liens. But this consideration is not decisive of the question here involved. Whether the statute required the affidavit or not, the fact remains that in this case the plaintiff did verify the lien, and that the signature of the plaintiff's president to that affidavit is the only signature or authentication or means of identifying and connecting the plaintiff with the paper. Under such circumstances the paper was a single, entire instrument, and it devolved upon the plaintiff to read the whole of it, and the trial court erred in ruling as it did upon this question. [Lee v. Lee, 21 Mo. 531; Bompart's Admr. v. Lucas, 32 Mo. 124; Crone v. Dawson, 19 Mo. App. 214; Haddaway v. Post, 35 Mo. App. 278; Starkie on Ev. (8 Am. Ed.), 528.]

By these amendments and his omission to read the whole of the lien, the plaintiff attempted to cure the defect in the petition and lien that sought to establish a lien on only a part and not on the whole of the defendant's railroad in Missouri, for both the petition and the lien omitted to ask for a lien on that part of the defendant's railroad that lies in the counties of St. Charles, Warren, Montgomery, Callaway, Boone and Howard and in Johnson and Cass. This defect was fatal to the claim for a lien, and the plaintiff sought by these means to overcome the difficulty. [23 Am. and Eng. Ency. Law (2 Ed.), p. 720, and cases cited; Knapp v. Railroad, 74 Mo. 374; Cranston v. Trust Co., 75 Mo. 29; Bethune v. Railroad, 149 Mo. 587.]

Because the claim for this lien did not cover the whole of defendant's railroad, the plaintiff was not entitled to a lien in this case, and the trial court should have so declared as a matter of law.

There is, however, another and a more important consideration presented with respect to the lien claimed in this case. The materials were shipped from Arkansas to Wagoner, Indian Territory, and were used on

the railroad in that territory and in the State of Texas. No part of them were used or went into the defendant's road in Missouri. The question, therefore, is whether the plaintiff is entitled to a lien on the railroad in Missouri, under the circumstances. The plaintiff claims a right thereto under section 4239, Revised Statutes 1899, and under the decision of this court in Bridge Co. v. Railroad, 72 Mo. 664, which case is cited in Ireland v. Railroad, 79 Mo. 572. If the case referred to correctly interprets the statute of this State, the plaintiff's contention is thereby supported and established; otherwise, not.

The statute (R. S. 1899, sec. 4239) is the same as the act of 1873 construed in that case, and is as follows:

"All persons who shall do any work or labor in constructing or improving the roadbed, rolling stock, station houses, depots, bridges or culverts of any railroad company, incorporated under the laws of this State, or owning or operating a railroad within this State and all persons who shall furnish ties, fuel, bridges or materials to such railroad company, shall have for the work done and labor performed, and for the materials furnished, a lien upon the roadbed, station houses, depots, bridges, rolling-stock, real estate and improvements of such railroad, upon complying with the provisions hereinafter mentioned: Provided, such work and labor is performed, and such materials are furnished, under and in pursuance of a contract with the railroad company, its agents, contractors, subcontractors, lessees, trustees, or construction company, organized for the uses and purposes of such railroad company, or having in charge the building, construction or improvement of such railroad, or any part thereof."

In construing this statute it was said in Bridge Co. v. Railroad, 72 Mo. l. c. 665:

"The point made by defendant's counsel is, that the proceeding is to establish and enforce a lien upon

the property in this State for a debt incurred by defendant in building a bridge in the State of Kansas, and asks, 'How could a corporation in this State have a franchise to build a road in Kansas, without the laws of Kansas governing as to the remedies, liens,' etc.? There is nothing in the Constitution of this State, or the Constitution of the United States, which prohibits the Legislature of this State from giving, even a creditor in Kansas, a lien for his debt upon the property of his debtor in Missouri, whether the debtor be a resident of Kansas or of this State. Certainly it is within the power of our General Assembly to give a mechanic residing in this State, for work done or materials furnished in the State of Kansas, a lien upon the real estate owned by the debtor in this State. The propriety of such legislation is another matter, with which we have no concern. By the first section of the act of March 21, 1873 (R. S. 1879, sec. 3200) 'all persons who shall do any work or labor in constructing or improving the roadbed, etc., of any railroad company, incorporated under the laws of this State, or owning or operating a railroad within this State, and all such persons who shall furnish ties, fuel, bridges . . . to such railroad company, shall have . . . a lien upon the roadbed, station houses, depots, bridges, rolling stock, real estate and improvements of such railroad, upon complying with the provisions hereinafter mentioned; provided, such work and labor is performed, and such materials are furnished, under and in pursuance of a contract with such railroad company, its agents, contractors, subcontractors, lessees, trustees, or construction company, organized for the uses and purposes of such railroad company, or having in charge the building, construction or improvement of such railroad, or any part thereof.' It is alleged in the petition that the defendant corporation has continued its road from the western line of this State into the State of Kansas, and through the county of Cherokee, in said State, and over

Spring river, in said county; that the railroad of defendant is a continuous road from Pierce City, in this State, to and beyond the bridge in question, in the State of Kansas; that the contract for this bridge was made by the defendant with the plaintiff. The statute is express, that whoever shall furnish ties, fuel, bridges, etc., to a railroad company, under a contract with said company, shall have the lien specified. There is nothing in the act to restrict this right to a lien to those who perform work on or furnish materials for that part of the road lying in this State. The petition alleges that the defendant company owns and operates the road in Kansas. By what authority, is not shown, nor was it necessary to allege. If the allegation is not true, and is material, the defendant must put it in issue by answer.''

Thus it appears the decision in that case was made to depend, not upon whether the statute expressly or by fair intendment granted a right to a lien under such circumstances, but whether a statute which did give such a lien was prohibited by the Constitution of this State or of the United States. It was first assumed that the statute conferred a lien and then its constitutionality was upheld. The constitutionality of the statute was not attacked. What the defendant claimed in that case was that the statute conferred no right to a lien under the facts and circumstances in judgment. In other words the defendant asked an interpretation or construction of the statute, and the court ignored the request and passed on the constitutionality of the statute, when no such issue was in the case.

It will, of course, be conceded that the statute is constitutional, and that the Legislature had the power to give a lien on the railroad in Missouri for work and materials done and furnished for the railroad in Kansas and the Indian Territory, but the crucial question is, has the Legislature conferred any such right by the statute quoted?

The language of the statute is, ''All persons who

shall do any work or labor in constructing or improving the roadbed, rolling stock, station houses, depots, bridges, or culverts of any railroad company, incorporated under the laws of this State, or owning or operating a railroad within this State, and all persons who shall furnish ties, fuel, bridges or materials to such railroad company, shall have, for the work done and labor performed, and for the materials furnished, a lien," etc.

The words employed do not grant or deny in express terms a right to a lien upon the railroad in Missouri for such labor and materials done or furnished in Kansas. The intention of the lawmakers and the meaning of the statute must be ascertained, therefore, from the context, the spirit and purpose, the objects to be attained and the evils to be corrected, and the common sense of the enactments.

*Quoad* the State of Missouri and the lien, the railroad must be regarded as a unit, an entirety, so far as it lies within the territorial limits of the State. With the railroad that lies beyond the jurisdiction of this State, neither the lawmakers nor the courts of this State have any concern or right to deal. Primarily the laws of this State are enacted for the benefit of the citizens of this State, and for the upbuilding and fostering of the institutions and business interests within the confines of the State; secondarily, for the benefit of the strangers within its gates who are lawfully here and whose lives, liberty and property are within the borders of the State. The courts of this State are open to such persons to enforce all just claims against the citizens of this State. But neither this nor any other court ought to construe a law of this State as conferring a right upon a citizen or a stranger in this State to a lien upon property in this State, for work and labor or materials done or furnished in another State, for the upbuilding of an improvement in such other State. Noth-

ing short of a clear, positive, unequivocal enactment to that effect should be so construed by the courts.

Speaking to the general proposition this court has held that the homestead laws of this State apply only to homesteads acquired as the laws of this State provide, and that a homestead acquired in this State with the proceeds of the sale of a homestead in another State, is liable for debts contracted before the deed to the homestead in this State was filed for record. [State Bank of Eagle Grove v. Dougherty, 167 Mo. 1.]

So, too, this court held that the statute which makes it a crime to give a deed to property previously sold or incumbered without reciting the former conveyance, has no extraterritorial effect, and does not apply to the case of a deed made in this State to real property lying in another State. [State v. Clark, 178 Mo. 20.]

The general rule in reference to railroad liens is thus stated in 23 Am. and Eng. Ency. Law (2 Ed.), p. 723: "Statutes of this class have no extraterritorial force, and are inapplicable to a foreign railway company contracting in another State for the construction of the part of its road lying therein."

The case of Cartwright v. Railroad, 59 Vt. 675, is quoted in support of the text. In that case it appeared that contractors with the railroad employed the plaintiff in the State of New York to do work upon the part of its road in that State, and the plaintiff brought suit therefor in the State of Vermont and sought to get the benefit of the Vermont statute which made railroad companies liable to day laborers employed by contractors for labor performed on such railroad. A recovery was denied, and it was held that the statute had no extraterritorial effect and was not effective in plaintiff's favor.

In De Witt v. Burnett, 3 Barb. 89, the plaintiff sold supplies to the defendant for his boat, in New York. The statute of Ohio gave a lien on the vessel for supplies, but the statute of New York did not do so. When

the boat went to Ohio, the plaintiff went to Ohio and proceeded under the laws of that State to enforce a lien against the boat. He got a judgment. The owner sold the boat to a citizen of New York before the seizure of the vessel in Ohio, and the case arose between the rights of the plaintiff under the Ohio statute and those of the vendee of the owner. It was held that the Ohio statute was ineffective as against the rights of such grantee, and that the Ohio judgment was not even evidence in New York against the vendee.

It does not appear in this case whether or not the laws of Kansas and of the Indian Territory give a lien for ties furnished to a railroad. If they do, there appears no reason why the plaintiff did not avail itself of those laws. If they do not, no good reason appears why the plaintiff should be permitted to avail itself of the lien laws of this State to enforce a lien against the railroad in this State for materials that went into the railroad in another State.

If such a proceeding was permitted it could easily be seen that the security afforded to the citizens of this State by the lien laws thereof, could be seriously impaired. For, if the citizen of this State was required to pro-rate for materials used in this State with the citizens of another State for materials furnished and used in another State, the latter might so far exceed the former as to destroy the value of the security afforded by the lien laws of this State for materials used in this State. To illustrate: If the value of the railroad in this State was one hundred thousand dollars, and the claim of the citizen of this State was only one thousand dollars, the security would be abundant. But if the railroad owned property in another State that was worth a million dollars, and if it owed a million dollars for materials furnished and labor done in building the road in such other State, and if the laws of that State gave or did not give a lien for such labor and material in such State, but the contractor was al-

lowed to come into this State and secure the benefit of the lien laws of this State, and fasten a lien of a million dollars on the part of the railroad in this State, and if the citizen of this State is compelled to pro-rate with the citizens of such other States, it at once appears that the rights of the citizen of this State would, thereby, be seriously impaired.

It may be said that the same results would ensue in case of general judgments or attachments, but the answer is that they are recognized and permitted by our laws, whereas the lien law does not so provide in express terms, or by necessary implication, nor is there anything in the law which warrants the courts in holding that the Legislature so intended when enacting the lien laws relating to railroads.

It follows that the case of Bridge Co. v. Railroad, 72 Mo. 664, was improperly decided, and it is therefore overruled. It also follows that the plaintiff is not entitled to a lien in this case, and the judgment of the circuit court establishing such a lien is reversed.

## II.

The next question in this case is whether the plaintiff is entitled to a personal judgment against the defendant, under the facts disclosed by this record.

The petition predicates a right to recover upon a joint contract between the Missouri, Kansas and Texas Railroad Company and Graham & Miller, parties of the one part and the plaintiff, party of the other part. The plaintiff's first instruction follows the petition and requires the jury to find that there was such a joint contract, and the defendant's instructions also require the jury to find that there was a joint contract. But for some inconceivable reason the plaintiff's second instruction authorizes the jury to find that the plaintiff is entitled to a lien if the plaintiff furnished and delivered the ties, "provided such ties were furnished under and

in pursuance to one contract with such railroad company or its agents, or its tie contractors,'' if the steps required by the statute for securing such a lien were taken.

The lien, as well as the petition, charges a joint contract with the railroad company and Graham & Miller, and the petition makes no distinction between the right to recover on the contract and the right to a lien. And manifestly no such distinction could exist, for it could not be true that the contract was joint, but that the right to a lien rested upon a single contract with the railroad company. So that while the instruction relates only to the lien, it was error to give it under the pleadings and the lien filed, as it is impossible to separate its influence upon the jury in respect to the finding upon the contract. For this reason the personal judgment upon the contract must be reversed.

But there are other and graver reasons which lead to the same result.

The petition charges a joint contract, and the plaintiff must recover upon that theory or it can not recover at all. The evidence must tend to support a joint contract, and unless it does so the plaintiff can not recover in this action notwithstanding the evidence may disclose a right to recover upon some other cause of action not pleaded. [Cole v. Armour, 154 Mo. 1. c. 351, and cas. cit.; Chitty v. Railroad, 148 Mo. 1. c. 74-75, and cas. cit.; s. c., 166 Mo. 435.]

The plaintiff produced only two witnesses who pretended to have any personal knowledge of the contract, and they were J. T. Miller, of the firm of Graham & Miller, and William Bagnell, the plaintiff's president. Miller testified that he tried to buy ties from the plaintiff but was refused; that subsequently he carried the letter of April 19th (which did not then contain the postscript) from Stevens to Bagnell and that was the last he had to do with the matter; that he made no contract with the plaintiff; that he was a mere ''go-

between;'' that the price of the ties was agreed upon before the letter of April 19th was written.

The testimony of this witness certainly does not tend in the slightest degree to support the allegations of the petition that the plaintiff had a joint contract with the railroad company and Graham & Miller, but shows exactly the contrary to be true.

This leaves only the testimony of William Bagnell. He testified that he many times refused to sell ties to either the railroad company or to Graham & Miller, and that he would not sell to Graham & Miller at all, because he knew they were doing business on borrowed capital. He then testified that on April 19th, he was in Stevens's office, and Stevens said to him that he had offered to sell ties to the railroad at thirty-eight or thirty-nine cents; and he answered that he had, but that was a year previous, and things had changed, and he could not do so then, adding, ''The price I want now is forty-five cents.'' Stevens then asked him to give him a price, free on board at the point of loading, and he would arrange about the freight. Bagnell replied, ''No, but I'll tell you what I'll do; I'll make you a price at forty-three cents, f. o. b. cars Wagoner.'' And Stevens replied, ''That's all right.'' He then testified that that ended the conversation. He then testified that he received the letter of April 19th, and that he and the secretary of the plaintiff company went to Stevens' office, and he told Stevens he objected to the letter because it said that he had agreed on the price of the ties with Graham & Miller, and that the fact was he had not then agreed on the price, and he asked that the words ''have agreed'' be changed to ''may agree,'' and that Stevens made the change, and that then, because of a prior difficulty about inspection, the postscript was added. He then testified, ''That letter that you have there from Captain Stevens and with the understanding and talk I had with Captain Stevens, makes the contract.''

It admits of no cavil that this testimony does not even tend to establish a joint contract with the railroad company and Graham & Miller. The conversation with Captain Stevens, taken alone, would be evidence tending to show a contract with the railroad company alone. But when the conversation is taken in connection with the letter of April 19th, even the contract with the railroad alone is disproved, for the letter recites that in consideration of the plaintiff letting the railroad company's tie contractors have the ties at a price which "you [the plaintiff] may agree on with Messrs. Graham & Miller," the railroad agrees to keep out of the plaintiff's territory for the year 1899. And Bagnell says that when that letter was changed and signed and the postscript added, he had not agreed upon a price with Graham & Miller.

The talk with Stevens tended to make a single, separate contract with the railroad. The letter tended to show that a single, separate, subcontract under Graham & Miller, the general tie contractors, was to be made, and would be made. The two taken together, as Bagnell says they must be and as so taken make the contract, do not show any contract with anyone. For they cut each other's throats, in as much as there could not be a single contract with the railroad and at the same time a subcontract under Graham & Miller for the sale of the identical ties. But in no view that could be taken of them, do they singly or together furnish any evidence whatever of a joint contract with the railroad company and Graham & Miller, which the plaintiff must show to recover in this case.

In fact, there is not one word of evidence in this case, that in the remotest or slightest degree, tends to show that the plaintiff had any contract whatever with Graham & Miller, of any kind, either joint or several. Miller says his firm never made any such contract.

Bagnell says he always refused to sell to Graham & Miller. Bagnell says he had the letter of April 19th changed because it recited that the plaintiff had agreed on a price with Graham & Miller, whereas no such agreement had been made. And neither Bagnell nor anyone else undertakes to tell when or how or where the plaintiff after that letter was so changed, or at any time, ever agreed upon any price with Graham & Miller.

The result is there is not a scintilla of evidence in the case to support the allegations of the petition that the plaintiff sold the ties under a joint contract with the railroad company and Graham & Miller, and therefore there is no evidence to support the verdict.

It is true that several times in the course of his examination and cross-examination Bagnell said that his claim was that his contract was a joint one with the railroad company and Graham & Miller, but this is a mere conclusion of the witness, and does not constitute testimony of the fact, and it is equally true that while so saying, he as often said that his contract was with the "M., K. & T.," or that the conversation and the letter of April 19th made up his contract. So that in any event the utmost that could be said of his conclusion that the contract was a joint one, is that that conclusion is diametrically opposed to his other statements of the facts and his other conclusion aforesaid. As the witness could not finally locate himself as to the facts he desired to testify to, it would be mere guesswork for the jury to locate him. Under such circumstances it leaves the case in the same condition as if the witness had not spoken at all, and in this case the result is that there was no evidence to take the case to the jury under the issues joined.

This is not a case of a mere variance, which is cured by the verdict under the statute, but it is a total failure of proof, which is fatal to the verdict. [Reed v. Bott, 100 Mo. 62; Faulkner v. Faulkner, 73 Mo. 327; Munn v. Haynes, 46 Mich. 140; Hudson v. Emmons, 107 Mich.

549; Gamble v. Kellum, 97 Ala. 677; York v. Fortenbury, 15 Colo. 129; Palmer v. Lavigne, 37 Pac. 775; Lee v. Wimberly, 102 Ala. 539; Garrison v. Lumber Co., 111 Ala. 308.]

Nor can the other circumstances of the case, or the dealings of the parties with reference to the ties, be invoked to help out this failure to prove the contract as alleged, for Bagnell says that, except for two checks which his company received from Graham & Miller, his company had no relation with Graham & Miller, and that he does not know what interest they had in the matter and had stopped thinking about what their position in the matter was. Of course it will not be contended that the payments by Graham & Miller tend, of themselves, to show a joint contract with the railroad company and Graham & Miller. Those payments rather tend to show that the plaintiff was a subcontractor under Graham & Miller, and if that is true, there would be no privity of contract between the plaintiff and the railroad company.

Upon the case made, therefore, the conclusion is irresistible that there was no evidence adduced which entitled the plaintiff to have the case submitted to the jury, and that the court should have sustained the demurrer to the evidence.

For this reason the judgment of the circuit court is reversed, and the cause remanded for trial anew in accordance herewith. *Brace, P. J.,* and *Robinson, J.,* concur *in toto; Valliant, J.,* concurs as to the first paragraph and as to the result, but dissents in a separate opinion as to a part of the second paragraph.

DISSENTING OPINION.

VALLIANT, J.--The first paragraph of the opinion of the court in this case holds that our statute (art. 4, chap. 47, R. S. 1899), does not give a lien on a railroad in this State for the price and value of labor and

materials put into the construction of a railroad in another State.     I fully concur in that interpretation of our statute.

I also concur in the criticism of the second instruction given for the plaintiff.

The plaintiff does not sue as a subcontractor, and, therefore, was not entitled to a lien as such, yet the instruction authorizes the jury to find that the plaintiff was entitled to a lien if the ties were furnished under a contract made either with the railroad company or its agents *or its tie contractors.*     Although the instruction related only to the lien, yet as the plaintiff was suing as the original contractor he was not entitled to a lien unless he was also entitled to a personal judgment and if he was entitled to a lien he was entitled to a personal judgment.     Therefore when the court instructed the jury that the plaintiff was entitled to a lien if the ties were furnished under contract with the tie contractor the instruction was liable to mislead the jury into the conclusion that on the whole case the plaintiff could recover as well on a contract made with the tie contractor as on one made with the railroad company.     For that reason the personal judgment can not be affirmed.

But I dissent from so much of the opinion of the court as holds that under the amended petition the plaintiff can not recover a personal judgment against the railroad company on evidence tending to prove that the contract was made with the railroad company alone. True it is charged in the amended petition as the joint contract of the railroad company and Graham & Miller, but under our statute joint contracts are joint and several and a plaintiff may sue two on a joint obligation and recover only against one if his proof entitles him to no more.

And I also dissent from the conclusion reached in the opinion of the court that the evidence in this case was not sufficient to sustain a personal judgment against the railroad company.     The testimony of Mr. Bagnell

shows that whilst Graham & Miller were somewhat vaguely mixed up in the matter, yet from first to last he was unwilling to make a contract with them, but looked to the railroad company alone as the responsible purchaser, and that he made the contract with the railroad company through its purchasing agent.

If it were not for the error in the second instruction I should hold that the personal judgment ought to be affirmed.